**CHICAGO, R. I. & P. RY. CO. v. BROOKS, Adm'x.**

No. 19860. Opinion Filed Oct. 27, 1931.

Rehearing Denied Feb. 9, 1932.

W. R. Bleakmore, John Barry, W. L. Farmer, and Robert E. Lee, for plaintiff in error.

Ledbetter, Stuart, Bell & Ledbetter, and Morrison & Morrison, for defendant in error.

McNEILL, J. This is an appeal from the judgment of the district court of Canadian county rendered in favor of the plaintiff below, Emmie P. Brooks, administratrix of the estate of Oscar L. Brooks, deceased, defendant in error, against the Chicago, Rock Island & Pacific Railway Company, plaintiff in error.

The parties will be referred to as they appear in the trial court. The cause was tried to a jury, and the jury awarded plaintiff damages in the sum of $35,000. The action was instituted by the administratrix of the estate of Oscar L. Brooks, deceased, against the railway company. The peti'ion alleged that Oscar L. Brooks was employed by the Chicago, Rock Island & Pacific Railway Company as a section or track foreman on its line of railway between Mangum and Granite; that said company had constructed between said points a pile-driven trestle bridge about 900 feet in length across Elm creek or Elm river of Red river. which bridge was within the section of track under the jurisdiction of said Brooks; that said river flowed through a low bottom about a mile and a half or two miles in width; that there is usually very little water passing under said bridge, but periodical floods came down said river filling up the low bottom, from the high banks on the east to the high banks on the west; that during these periodical floods the waters would come down said low bottom under said bridge, and strike the bents of said bridge; that the bed of said river for a distance of some 200 or 300 feet, beginning at the east end of said bridge and extending in a westerly direction, is underlaid with some kind of hard substance covered with only a few feet of soil or sand.

That the bridge so constructed was at flood time dangerous to employees and others

whose duties required them to go upon or across the same; that it consisted in part of bents, composed of five piling to a bent; that it was the duty of the railroad company to drive the piling for the bridge a sufficient depth to give the bridge lateral support, which plaintiff alleges should have been from 10 to 12 feet through the soil; that said railway company negligently and carelessly constructed its said bridge for a distance of 200 to 300 feet across the current of said river by erecting the same upon piling driven only from two to eight feet without anchoring or fastening the end of said piling in any manner to the hard substance underlying the soil or sand across said current of said river; that the bridge was carelessly and negligently maintained with rotten brash, insecure piling, girders, and ties, and other materials which rendered said bridge dangerous and insecure for the use of its employees whose duty required them to cross or be upon said bridge during flood time.

That on the 3rd day of October, 1926, when a flood was coming down said river, and after some of the bents placed in said bridge had been washed out, and at a time when rotten piling, stringers, ties, and other material were in said bridge, Brooks was ordered by D. B. Burke, agent of the railway company, to go from Mangum across the said bridge with a motor car or speeder to the station of Granite, which was some ten miles east of the city of Mangum, and there meet one of the railway company's passenger trains, transfer the mail and express from said train over and across said bridge to the city of Mangum; that while said Brooks was complying with said orders and performing his duties incident thereto, by reason of the negligence and carelessness of the defendant railway company, in negligently and carelessly constructing and maintaining said bridge and permitting rotten and weak piling, stringers, ties, and other material to be and remain in said bridge, and while the said Brooks was upon said bridge, said bridge gave way and precipitated Brooks into the waters of said river, injuring him about the head, legs, and body to such an extent that he was unable to rescue himself, and after struggling in said water for a period of 30 minutes, he was drowned.

The railway company demurred; the same was overruled and exceptions allowed. By answer it denied all the material allegations of plaintiff's petition, admitted its corporate existence, and that the rights, duties, and liabilities of the parties came within the Federal Employers' Liability Act of Congress. It specifically pleaded that the decedent, Brooks, assumed the risk, alleging that Brooks had been employed as section foreman upon this particular line for a period of 12 years; that while he was engaged as section foreman he fully understood, knew, and appreciated the nature, extent, and character of the dangers and hazards of the work required of him; that as section foreman it was his duty to see and be responsible for the safety of the track and railroad bridges of the railway company at the point where the accident complained of occurred; that it was his duty to make a thorough inspection and ascertain the safe or unsafe condition of said bridge, track, rails, grade, and embankment, and report or repair the same; that when the accident complained of occurred, the decedent did know the actual condition of said bridge and trestle work, and did know that flood waters were then raging in said Elm creek, and knew that a part of the bridge had already washed out, and knew that more of said bridge or the entire bridge might at any time be washed away, and knew and appreciated all of the circumstances and conditions pertaining to said bridge and stream, and by reason of such facts he assumed the risk incident to the hazards and dangers presented by said bridge.

It specifically pleaded that it was not necessary for decedent, in the performance of his duties, to go out upon said bridge at the time he ventured out upon the same, but that his duties required him to inspect said bridge at a safe distance from the place where the bent of said bridge had been washed out and torn away; that if he went out upon said bridge, said act was unnecessary and was not authorized or directed by the defendants. Defendant railway company, answering further, pleaded contributory negligence.

Plaintiff filed a reply denying the new matter in said answer contained.

Plaintiff in error in its petition in error specifies 49 grounds of error and presents in its brief 22 assignments of error, and discusses the same under 15 separate propositions of law.

Counsel for plaintiff contend that the piling did not have sufficient penetration in the shale or rock in the current of the creek so as to properly anchor the same, and that the defects in the bridge consisted of rotten piling, which was the cause of the fall of the bridge, which resulted in the death of the decedent. The bridge was constructed by the B. & B. department of the defendant, whose duty it was to make its bridge reasonably safe, and plaintiff contends that if the bents had had sufficient penetration and

anchorage in the shale, and had been in good condition, the bridge would not have fallen; that the master, the railway company, failed to do its duty in this respect in not furnishing the deceased a reasonably safe place within which to work.

On the date of the accident, October 3, 1926, the conductor on the morning passenger train observed the condition of the creek or river as his train passed over the bridge, and sent a wire to the Mangum operator, and the Mangum operator notified Brooks, who took his section crew on a motor car and went to the bridge for the purpose of watching the same and reporting any change in its condition.

At 2:05 p. m. on said day, the deceased sent the defendant at its headquarters at El Reno the following telegram:

"Later, two bents on east end bridge 5279 across Elm Fork river washed out and think there will more go. Will need pile driven and bridge crew. O. L. Brooks, Sec. Foreman."

At 4:10 p. m. of same day, deceased sent the following telegram to defendant at El Reno:

"Later, three more bents washed out of bridge 5279, a total of five bents now gone, more expected to go out. 15 feet rise and still rising. O. L. Brooks."

The defendant, at 4:17 p. m., sent the following telegram to deceased, Brooks:

"If speeder can cross bridge, line up connect with 705 at Granite and handle mail, express, etc., to Mangum."

There was very little difference in the change of the height of the water. It arose some one or two inches during the afternoon. It was about 15 feet from the deck of the floor of the bridge at the time of the accident, the piling being about 35 feet long. Shortly before the accident, Brooks ordered three of his crew to take a push car across the bridge. Brooks followed the men and then returned to the bank, and then walked back on to the bridge and was about where the three standing bents were when there was a snapping and a crashing, and the entire bridge went in, making a gap of about 204 feet in the bridge. Brooks fell, and after struggling in the water for about 30 minutes was drowned. Just prior to the collapse of the bridge there were three bents left standing, near the center of the current, giving 28 feet of support. On the east, or Granite side, there were four or more bents out in a row, leaving a gap of 70 feet or more unsupported; passing the three bents was another gap of four or more in a row, making another gap unsupported. The evi-

dence shows that prior to the accident, bents had given out of the bridge six times since and including 1921, but that only once during this time had the bridge or deck fallen.

Plaintiff contends that the rule of assumed risk is one of "contract" and the rule of contributory negligence is one of "conduct," and that the going of Mr. Brooks from the bank on to the bridge just before it fell was a matter of conduct, and if same was a matter of conduct, it falls within the term of contributory negligence; that even though the deceased was guilty of contributory negligence, the Federal Employers' Liability Act does not bar the plaintiff from recovery, but the recovery would be reduced under the comparative negligence rule in the proportion of the comparative negligence of the master and servant.

Defendant states in its proposition No. 3 as follows:

"A master has discretion concerning the kind of tools and appliance which he will furnish his employees, provided the tools and appliance so furnished are reasonably sound and safe. In determining whether or not the master was negligent in furnishing the particular machinery, tool, or appliance, the test to be applied is whether or not such type of machinery, tool, or appliance is used by the fair average of others in the profession or trade of the master; the standard of due care being the conduct of average prudent man."

On this question, the court submitted the proper instruction No. 10 as follows:

"You are further instructed that it was the duty of the defendant railway company to furnish the plaintiff's decedent a reasonably safe bridge, and in this connection, you are instructed that it was not obliged to use the safest and most improved methods of construction, but in the construction of this bridge, to use that degree of care that ordinarily prudent and careful railroads used at the time and prior to this accident under the same or similar circumstances. A failure to do so would be negligence."

On this question of the penetration and anchorage, five civil engineers testified that in building such bridges, the piles should penetrate deeper than was done in the instant case, and should be anchored to a hard substance.

The jury was properly advised that the defendant company was not required to use the safest and most improved methods of construction in the construction of its bridge, but that it should use that degree of care that ordinarily prudent and careful railroads used at the time and prior to the accident under the same or similar circumstances.

Counsel for defendant under their fourth proposition state as follows:

"The duty to furnish a safe place does not exist where the servant is employed in making a dangerous place safe, or working at a place under conditions constantly changing."

There is no evidence that the defendant was employed in making a dangerous place safe. He was at the bridge to advise his superior officer as to the conditions surrounding the bridge, and to carry out the orders of his master in reference to taking the mail and express across the bridge in a speeder. His general work was that of a section man whose general duty was to work upon the track. It was the duty of the B. & B. department of the master to work upon the bridge. The deceased was not there to repair the bridge. There is nothing in the record to show that the decedent knew of any latent defects in the bridge in reference to anchorage of piling or of the condition of the piling.

Defendant urges proposition No. 5, that:

"The employer does not owe an employee the duty to furnish him a safe place or safe machinery with which to work, where it is the duty of the employee to inspect, repair, or reconstruct the place or machinery with which he is working."

It was the duty of the B. & B. department to repair or reconstruct the bridge.

We think the rule announced in the case of U. P. Railway Co. v. O'Brien, 161 U. S. 451, 40 L. Ed. 766, by Mr. Chief Justice Fuller, is applicable to the case at bar. It is as follows:

"The general rule undoubtedly is that a railroad company is bound to provide suitable and safe materials and structures in the construction of its road and appurtenances, and if from a defective construction thereof an injury happen to one of its servants, the company is liable for the injury sustained. The servant undertakes the risks of the employment so far as they spring from defects incident to the service, but he does not take the risks of the negligence of the master itself. The master is not to be held as guaranteeing or warranting absolute safety under all circumstances, but it is bound to exercise the care which the exigency reasonably demands in furnishing proper road beds, track, and other structures, including sufficient culverts for the escape of water collected and accumulated by its embankments and excavations. * * *

"It is the duty of the company, in employing persons to run over its road, to exercise reasonable care and diligence to make and maintain it fit and safe for use, and, where a defect is the result of faulty construction, which the employer knew or must be charged with knowing, it is liable to the employee, if the latter use due care on his part, for injuries resulting therefrom. * * *"

Plaintiff in error urges in assignment of error No. 4 that the trial court erred in permitting plaintiff's witnesses, H. G. Powell, W. C. Burke, W. C. Burham, and W. L. Starr, to testify, over the objection of defendant, that a pile-driven trestle bridge was an improper type of bridge for the railway company to construct and maintain at this point. Their testimony is to the effect that the pile-driven bridge constructed as this bridge was constructed would not be safe. The court properly presented this issue to the jury in its instruction No. 10, being as follows:

"You are instructed that it was not obliged to use the safest and most approved methods of construction, but in the construction of its bridge to use that degree of care that ordinarily prudent and careful railroads used at the time."

Also, in instruction No. 19, the court instructed in part as follows:

"If you find and believe from the evidence that, at that time and in its then condition, the bridge was then caused to give way and fall, by reason of rotten or unsound pilings or of any other defect as alleged in plaintiff's petition in the construction of said bridge caused by the negligence of the defendant and would not otherwise have given way, and that by reason thereof, the deceased while in the discharge of his duty was thrown into the water and drowned, you should then find for the plaintiff unless you find for the defendant in other instructions."

Defendant complains in assignment of error No. 5 as follows:

"The trial court erred in permitting the plaintiff's witnesses, Barnard Snyder, Andrew Carver, Okla. Carver, Howard McCloud, and John S. Faules, to testify that they found bridge timbers from one-fourth mile to six miles below this bridge after this flood, and that as many as seven bents were found containing defective piling, and at least one or more of the piling were broken."

This testimony was admissible as being one of the circumstances in the case at issue. Mr. Snyder, one of the witnesses, testified that he saw some of the bents as they washed out of the bridge, and in determining the proximate cause of any injury, it became necessary to depend upon the circumstances which can be shown by circumstantial evidence. The jury were entitled to receive all the surrounding facts and circumstances which might throw light upon the condition and construction of defendant's bridge. If the jury believed that the piling so found came from defendant's bridge, it

was proper that such evidence be admitted for their consideration. In connection with this testimony evidence was submitted in reference to the bridge of the Missouri, Kansas & Texas, which bridge was up the stream a few miles and did not go out at the time of this flood. This assignment of error is without merit.

Counsel for defendant complains in assignments Nos. 6 and 7 as follows:

No. 6. "The trial court erred in permitting the plaintiff's witness, O. A. Melton, to testify to the amount of penetration secured by the Katy railroad in its pile-diven bridge across this river, about six miles upstream from the Rock Island bridge."

No. 7. "The trial court erred in permitting the plaintiff's witness, O. A. Melton. to testify that the Katy bridge did not collapse in October, 1926."

The record shows that the bridge of the Missouri, Kansas & Texas Railway spanned the same stream about six miles from defendant's bridge. O. A. Melton testified as to amount of penetration of the pile bridge. There is evidence that the defendant's bridge had a penetration from three to eight feet before the hard surface was reached. The piling of the bridge of the Missouri, Kansas & Texas Railway penetrated 12 feet before the hard surface was reached. The testimony of Mr. Melton shows that the bridge of the Missouri, Kansas & Texas Railway, in 1926, did not wash out. W. L. Starr, another witness, stated that the soil which was washed out in the river bed under the bridge of the Missouri, Kansas & Texas was of the same character as the soil under the Rock Island bridge. The record shows that both of these bridges were pile-driven bridges. This was testimony developing facts and circumstances in the case and was proper.

Counsel also urge assignment of error No. 9, as follows:

"The court erred in permitting the plaintiff's witnesses, Edward Ewens, H. C. Powell, and W. C. Burke, to testify that if the piling in the bridge had proper penetration and was of sound material, that with four bents out, three bents standing, and a gap of four more bents, the bridge would be reasonably safe for employees to go out upon."

These witnesses qualified as expert civil engineers. They were asked in reference to the condition of the bridge that, if there were three bents standing and there was no drift and the water lacked about 15 feet of reaching the deck of the bridge. etc., if the piling in those bents were properly anchored in the shale, or the penetration was sufficient, would it be safe to go on the bridge? The witnesses were fully cross-examined upon the facts. The hypothetical question did not cover all the facts, but did cover substantial and material facts. On this question, Jones on Evidence, vol. 2, sec. 371, states as follows:

"The question is not necessarily to be rejected by the court, although the facts assumed by counsel to be true are not proved, or, although the question does not state the facts as they actually existed. The facts are generally in dispute; and it is sufficient if the question fairly states such facts as the proof of examiner fairly tends to establish and fairly presents his claim or theory. It cannot be expected that the interrogatory will include the proofs or theory of adversary. * * *

"A question should not be rejected because it does not include all the facts, unless it thereby fails to present the case fairly. * * *

"While, however, the hypothetical question to an expert witness should not contain matter which there is no evidence tending to support, technical accuracy is not required as to this."

Our own court, in the case of Shawnee Gas & Electric Co. v. Hunt, 32 Okla. 368, 122 P. 673, states as follows:

"A hypothetical question to an expert is not objectionable as assuming material facts which the evidence does not fully tend to establish, where there was some evidence of all the material facts assumed."

This was later approved by this court in the case of De Camp v. Comerford, 134 Okla. 145, 272 P. 475.

Counsel for defendant urge as one of the assignments of error that the court, in instructions Nos. 1 and 2, merely gave the statement as set forth in the pleadings of both parties. In this connection it is to be observed that counsel for the railway company requested the court to give 12 of defendant's requested instructions, and there is nothing in the record to show that counsel for defendant made any request of the court, or were denied the opportunity to prepare instructions and submit the same to the court, defining the issues in this case. It is to be presumed that counsel were content to rely on taking their exceptions to the issues presented by the court. The record is silent that they attempted to point out to the court wherein these instructions as given by the court were erroneous.

In the case of Seay v. Plunkett 44 Okla. 794, 145 P. 496, the court in the fifth paragraph of the syllabus states as follows:

"Where the court in other paragraphs of the charge has defined to the jury what the issues are between the litigants, a judgment will not be reversed merely upon the grounds that the court set out the pleadings

in full in his instructions to the jury, unless it is made to appear that the rights of the parties were prejudiced thereby."

.. This question has more specifically been considered in the case of St. Louis-San Francisco Ry Co. v. Routh, 133 Okla. 168, 271 P. 835, wherein error was urged on the ground that the trial court failed to properly define the issues to the jury, and in the instructions therein quoted extensively from plaintiff's petition. The court stated in the first paragraph of the syllabus as follows:

"Where the trial court, in stating the issues to the jury, quotes extensively from the pleadings, and substantially, though not accurately, states the issues, and opportunity is given counsel to inspect the instructions prepared by the court, and is given opportunity to prepare the instructions, and counsel fails to submit any instruction defining the issues, a case will not be reversed for failure of the court to accurately define the issues involved."

In the body of the opinion, the court therein quotes from the case of Schmucker v. Clifton, 62 Okla. 249, 162 P. 1094, being a case wherein the entire pleadings were submitted to the jury in lieu of statement of issues, as follows:

"While we think it would have been better practice to have more distinctly stated the issues involved in the trial than was done by copying into the instruction given the pleadings in the case, we think that, by reason of the opportunity given by the trial judge. who gave ample time and invited the attorneys for the parties to prepare instructions to be submitted to him, and to review the instructions prepared in the case before they were given to the jury, if the defendant felt that the issues had not been properly defined, then the attorney of the defendant should have prepared instructions and presented them to the judge, strictly defining the issues involved."

The same question as presented in the Routh Case, supra, was thereafter approved by this court in the case of St. Louis-San Francisco Co. v. Eaks, 141 Okla. 256, 284 P. 866.

The instructions offered and requested by defendant were not directed to any statement of the issues made in the case, and the instructions of the court were directed to the issues upon which the evidence was submitted. We find no reversible error in the statement of the issues in this case as made by the trial court. Had counsel for the defendant, who have had many years of practice as trial attorneys, offered a statement of the issues to the court, or pointed out to the court wherein the statements of the issues as defined by the court were in error, the trial court would have had an opportunity to correct such errors, if any, before the same were submitted to the jury. Counsel for the defendant did not see fit to do so. We do not find any reversible error in the court giving instructions Nos. 1 and 2, though we are not commending that trial courts should present the issues in a case to the jury by a literal copying of the pleadings.

Counsel also urge that error was committed by the court in giving instruction No. 21, relative to the measure of damages. Defendant's counsel submitted requested instruction No. 8, which made no mention of the conscious pain and suffering being one of the proper elements which the jury was entitled to take into consideration in fixing the damages, if any, which they might award to the widow and children in addition to the pecuniary loss sustained by them. Under the uniform ruling of this court, if there is any error in the requested instruction, it is not error for the court to refuse the same. Friedman v. Weisz, 8 Okla. 392, 58 P. 618; Sanders v. Cline, 22 Okla. 154, 101 P. 267; Fulsom-Morris Coal & Mining Co. v. Mitchell, 37 Okla. 575, 142 P. 1103.

In this case damages for conscious pain and suffering were specially pleaded and prayed for in the prayer of plaintiff's petition.

Mr. Snyder, one of the witnesses on behalf of the plaintiff, testified that he saw the decedent struggling in the water and tried to rescue him and that decedent spoke to him in reference to receiving a broken leg, although an examination of body of deceased as disclosed by the record shows that no bones had been broken. The witness also testified that decedent entreated the witness to save him and get him out of the water; that decedent's face was white and that decedent impressed him as being a person in great fear; that while decedent was being carried down the stream, the witness followed him along the bank of the river for about 30 minutes, and then the body disappeared.

Since the amendment of April 5, 1910, in an action under the Federal Employers' Liability Act, the courts have held that while there can be but one recovery for the death of an employee by wrongful act, damages may be recovered both for the pecuniary loss to the beneficiaries and for the pain and suffering endured by the injured employee. 8 R. C. L. 844, citing Ann. Cas. 1914C, 182.

The Supreme Court of the United States, in the case of St. L., I. M. & S. R. Co. v. Craft, 237 U. S. 648, 59 L. Ed. 760. in construing sections 1 and 9 of the Federal

Employers' Liability Act, as amended, speaking though Mr. Justice Van Devanter, says:

"But the original act is not alone to be considered. On April 5, 1910, prior to the decedent's injuries, the act was 'amended by adding the following section':

"Sec. 9. That any right of action given by this act to a person suffering injury shall survive to his or her personal representative, for the benefit of the surviving widow or husband and children of such employee, and, if none, then of such employee's parents: and, if none, then of the next of kin dependent upon such employee, but in such cases there shall be only one recovery for the same injury. * * *

"And when this provision and section 1 are read together, the conclusion is unavoidable that the personal representative is to recover on behalf of the designated beneficiaries, not only such damages as will compensate them for their own pecuniary loss, but also such damages as will be reasonably compensatory for the loss and suffering of the injured person while he lived. Although originating in the same wrongful act or neglect, the two claims are quite distinct, no part of either being embraced in the other. One is for the wrong to the injured person and is confined to his personal loss and suffering before he died, while the other is for the wrong to the beneficiaries and is confined to their pecuniary loss through his death. One begins where the other ends, and a recovery upon both in the same action is not a double recovery for a single wrong but a single recovery for a double wrong."

In the case of Louisville & N. R. Co. v. Holloway, Administrator of the Estate of John G. Holloway, Deceased, 62 L. Ed. 867, 246 U. S. 525, wherein the trial court instructed the jury that if they found for the plaintiff the measure of recovery was

"Such an amount in damages as will fairly and reasonably compensate the widow of the said John G. Holloway, deceased, for the loss of pecuniary benefits she might reasonably have received, if the deceased had not been killed, not exceeding the amount claimed: to wit, $50,000"

—the Supreme Court of the United States, speaking through Mr. Justice Brandeis, says:

"The instruction given, though general, was correct. It declared that the plaintiff was entitled to recover 'such amount in damages as will fairly and reasonably compensate' the widow 'for the loss of pecuniary benefits she might reasonably have received,' but for her husband's death. This ruling did not imply that the verdict should be for the aggregate of the several benefits payable at different times, without making any allowance for the fact that the whole amount of the verdict would be presently paid at one time. The instruction bore rather an implication to the contrary; for the sum was expressly stated to be that which would 'compensate.'"

In the case of Philadephia & R. Ry. Co. v. Briscoe, 279 Fed. 680, the Circuit Court of Appeals, Third Circuit, says as follows:

"The plaintiff was entitled to recover such an amount in damages as would fairly and reasonably compensate her and her children for the loss of pecuniary benefits which they might reasonably expect to have received but for Briscoe's death. Louisville & Nash. R. R. Co. v. Holloway, 246 U. S. 525, 38 Sup. Ct. 379, 62 L. Ed. 867; Gulf, Colorado & S. F. Railroad Co. v. McGinnis, 228 U. S. 173, 33 Sup. Ct. 426, 57 L. Ed. 785; Philadelphia & Reading Railroad Co. v. Marland, supra."

The Court of Appeals of Kentucky, 181 S. W. 1126, in the Holloway Case, supra, prior to the appeal of said case to the United States Supreme Court, in reference to the instruction above quoted, said:

"If an instruction phrased as this one was does not state correctly the measure of recovery, it would be difficult to frame one that would."

This instruction is very similar to the instruction on the question of pecuniary loss submitted in the case at bar. The trial court on this question stated to the jury that in the event the jury found that the "widow and children had suffered a pecuniary loss from the death of deceased, then the measure of damages to be recovered by the plaintiff for the benefit of the widow and children is that sum which will fairly compensate them for the loss of the contributions for their support and maintenance which they might, under all the evidence in this case, have received from said deceased for such period of time as he might reasonably have been expected to live, had said accidental injury and death not occurred." The instruction tendered by defendant on the measure of damages was not correct. The Supreme Court of the United States said in the Holloway Case, supra, as follows:

"Nor need we determine whether the local rule of practice, that if instructions are offered upon any issue respecting which the jury should be instructed, and they are incorrect in form or substance, it is the duty of the trial court to prepare or direct the preparation of a proper instruction upon the point in place of the defective one (see Chesapeake & O. R. Co. v. De Atley, 241 U. S. 310, 316, 60 L. Ed. 1016, 1020, 36 Sup. Ct. Rep. 564), was applicable in the case at bar. That is a question of state law, with which we have no concern."

The Supreme Court of the United States in the case of Michigan Central R. Co. v. Vreeland, 227 U. S. 59, 33 S. Ct. 192, in the opinion by Mr. Justice Lurton, said:

"No hard and fast rule by which pecuniary damages may in all cases be measured is possible."

The jury was warranted in finding under the pleadings some reasonable amount as damages for conscious pain and suffering in addition to the damages for pecuniary loss. All these matters were before the jury; the probable expectancy of the decedent, his age, health, earning capacity, the earning power of money which was testified to by one of the bankers, and the rate of interest realizable on prudent investment; all of which were proper questions for argument by counsel in their final arguments to the jury, under the evidence and instructions. The court instructed the jury, in addition to the question of damages, if any, for conscious pain and suffering, that if the jury found for the plaintiff it was their duty to ascertain an amount which would reasonably compensate the plaintiff for the pecuniary loss which plaintiff and the children sustained by reason of the wrongful death of the deceased.

We are of the opinion that no error is presented to this court by reason of instruction No. 21. There is no mathematical formula to present to a jury which may definitely guide them and be their rule for the measurement of damages. This question must be left to the jury to fix the amount authorized by the evidence in the light of the instructions of the court and if the instructions are proper on this question, and we so hold in the instant case, it is not the rule of this court to interfere with the same unless same is excessive.

In the case at bar the question of assumption of risk is a question of fact for the determination of the jury. It is an affirmative defense interposed by the defendant, and the jury resolved this question in favor of the plaintiff and against the defendant.

The question of whether or not there were latent defects in the bridge in question, and whether or not the piling and ties of the bridge were in a rotten condition, were also questions raised by the pleadings and presented issues of fact to be determined by the jury from all the facts and circumstances appearing in the evidence.

On the question of contributory negligence, even though the jury may have found that the decedent was guilty of contributory negligence, this would not bar or prevent the plaintiff's right of recovery under the Federal Employers' Liability Act. Contributory negligence under this act amounts to no more than a rule of conduct, and, if the decedent was guilty of contributory negligence, this would merely reduce the damages, if any, which plaintiff might be entitled to recover in this action.

Defendant contends that the decedent was guilty of contributory negligence when he went out upon the bridge after a portion of the piling, which has been heretofore described, had been washed away, contending that he was not proceeding as an ordinarily prudent person would under the same or similar circumstances.

In order to view the conditions as they were, it is necessary that they be viewed from the standpoint of deceased, to ascertain whether he was acting as an ordinarily prudent person would act under the same or similar circumstances. Negligence must be proven. It cannot be presumed.

An examination of the evidence shows that the witness Barnard Snyder stated in reference to the decedent going out upon the bridge just prior to the fatal accident as follows:

On cross-examination by Mr. Barry: "Q. Yes, sir. Now, I will ask you if it isn't true that he told you just before he went out on that bridge, he was going out to see if it would or if it was safe to get the mail across? A. He told me that, just before he was going out, he was going across to examine the bridge to see if it was safe to go and bring the mail. Q. He told you he was going out there to see if that bridge was safe, didn't he? A. See if it was safe enough to bring the mail across. Q. Well, it had to be safe to take the mail across, didn't it? A. Yes, Q. Now, did you know when he planned to leave that bridge and go to Granite to get anything? A. He was fixing to come back and go get the mail, it was nearly mail time."

In this connection it must be remembered that the decedent had reported the condition of the bridge to his superior officer. His superior officer had wired him as follows:

"If speeder can cross bridge line up connection seven naught five at Granite and handle mail express, etc., to Mangum."

The evidence shows that the condition of the bridge could not be ascertained from the bank. The decedent was watching the condition of the bridge in pursuance of his master's work. He might have been apprehensive as to whether the bridge would stand or not. He had received the wire in reference to handling the mail and express, if the speeder could cross the bridge. Just prior to the time that he walked out upon the bridge for the last time, he saw three or four persons cross the bridge with safety. An ordinarily prudent person, after witnessing this positive fact, would also have the right to consider whether or not the decedent was acting as an ordinarily prudent person

in going upon that bridge to ascertain the conditions as to whether he could obey the order in the wire he had received from his superior officer to handle the mail and express which was soon to arrive.

Armed with the authority received in the telegram from his superior officer, the jury was authorized to infer that when decedent walked upon this bridge for the purpose, as expressed in the language of the witness Snyder, "to examine the bridge to see if it was safe to go and bring the mail," he was proceeding in the path of duty and exercising the degree of care that an ordinarily prudent person under like or similar circumstances would exercise in endeavoring to carry on the work of his master.

Counsel for defendant urge that the verdict of the jury is excessive. It awarded to the plaintiff the sum of $35,000. The decedent had an expectancy of 31 years. At the time of his death he was receiving regular wages, $116 per month, or $1,392 per year. This annual wage computed for said period of expectancy would amount to the sum of $43,152, not including any increase of wages. On the basis of the wages decedent was earning at the time of his decease and the general nature of his work, and viewing all the facts and circumstances presented by the evidence, and considering that decedent lived no longer than approximately 30 minutes from the time he fell into the waters of the creek, and bearing in mind that it was within the power of the jury to reduce the damages for pecuniary loss, in the event plaintiff's decedent was guilty of contributory negligence, we are of the opinion that the ends of justice would be better served by requiring the plaintiff to file a remittitur in the sum of $17,500, in order to remove from the verdict any question of prejudicial elements, if any, contained therein.

Sutherland on Damages (4th Ed.) vol. 2, p. 1512, states:

"It was said that in fixing the amount of the recovery, the court will not be careful to see that it shall be sufficient to compensate for the injury, but rather that the amount remitted shall be large enough to strip the verdict of any prejudicial elements, giving the defendant the benefit of reasonable probabilities in respect to the amount of the recovery so that it shall clearly be regarded as not excessive." Citing St. Louis, Iron Mountain & Southern Ry. Co. v. Brown, 100 Ark. 107.

A review of this record shows that the trial court was careful in the presentation of the evidence to the jury, and that the instructions of the court to the jury were more favorable to the defendant than was authorized under the evidence.

This court has uniformly held when the jury has been properly instructed as to the law, and the evidence reasonably tends to sustain the verdict of the jury and a motion for a new trial has been denied, this court in such law action will not invade the province of the jury, weigh the evidence, and disturb the verdict. Anderson v. Cardwell, 130 Okla. 92, 265 P. 627.

We have examined this record with care, and in view of the remittitur required herein, a further discussion of assignments of error would serve no useful purpose. Suffice it to say that the questions at issue were fairly submitted to the jury under proper instructions of the court, and finding no reversible error in this case. except that the verdict is excessive, the judgment of the trial court is affirmed upon plaintiff's filing a remittitur in the sum of $17,500 within 20 days, otherwise this case is reversed and remanded for a new trial.

LESTER, C. J., and HEFNER, CULLISON, and SWINDALL, JJ., concur. CLARK, V. C. J., concurs in affirming trial court, but dissents as to remittitur for reason that the amount of the remittitur is too large.

RILEY, ANDREWS, and KORNEGAY, JJ., dissent.